IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | |
|---|---|
| LINCOLN GENERAL INSURANCE COMPANY, §§§§§ Plaintiff, §§ vs. §§ U.S. AUTO INSURANCE SERVICES, INC., GAMMA GROUP INC., CSI AGENCY SERVICES, INC., ALPHA PARTNERS, LTD., JAMES DOUGLAS MAXWELL a/k/a DOUG MAXWELL, SANTA FE AUTO INSURANCE COMPANY, and JAMES THORNTON MAXWELL a/k/a JIM MAXWELL §§§§§§§§§§§§ Defendants. § | CIVIL ACTION NO. _____ |

## ORIGINAL COMPLAINT AND MOTION
## FOR CERTAIN DEFENDANTS TO POST BOND

Lincoln General Insurance Company ("Lincoln General") files this Original Complaint against U.S. Auto Insurance Services, Inc. ("U.S. Auto"), Gamma Group Inc. ("Gamma"), CSI Agency Services, Inc. ("CSI"), Alpha Partners, Ltd. ("Alpha"), James Douglas Maxwell a/k/a Doug Maxwell ("Doug Maxwell"), Santa Fe Auto Insurance Company ("Santa Fe"), and James Thornton Maxwell a/k/a Jim Maxwell ("Jim Maxwell"), (collectively "Defendants") and for its claims would show this Court the following:

### I. INTRODUCTION

1.      Lincoln General is the reinsurer of various automobile insurance policies sold by U.S. Auto, as Managing General Agent for State and County Mutual Fire Insurance Company ("State and County").  As such, Lincoln General is entitled to a portion of the premiums arising

under the reinsured policies.  These premiums are forwarded to Lincoln General by U.S. Auto, which collects and handles the premiums and other funds related to the reinsurance arrangement as a fiduciary to Lincoln General and State and County.

2.      On November 27, 2007, Lincoln General filed a lawsuit ("First Lawsuit") against the Defendants in the United States District Court for the Northern District of Texas, Dallas Division.[1]  By such action, Lincoln General sought declaratory relief and to recover the amounts owed to it by Defendants pursuant to various General Agency Agreements ("GAA's") and corresponding Quota Share Agreements of Reinsurance and all addendums ("Reinsurance Agreements") attached hereto as **Exhibit A**.

3.      On May 7, 2009, all parties executed a Memorandum of Understanding ("MOU") that embodied an agreement to settle Lincoln General's causes of action against the Defendants in the First Lawsuit.  A true and correct copy of the MOU is attached hereto as **Exhibit B**.

4.      The MOU contained the following requirements:

(a)     Santa Fe was to enter into a Loss Portfolio Transfer Reinsurance Agreement which would reinsure Lincoln General for all past and future losses, payments, risks, and liabilities arising in connection with the GAAs and Reinsurance Agreements and all addenda to those agreements for all payments completed after May 4, 2009;

(b)     On or before June 30, 2009, Santa Fe, as partial security for its obligations to Lincoln General, was to provide security by either escrowing $3 million in a Regulation 114 Trust Account or obtaining $3 million in reinsurance

---

[1]      Cause No. 3:07cv1985-B; *Lincoln General Insurance Company v. U.S. Auto Insurance Services, Inc., Gamma Group Inc., CSI Agency Services, Inc., Alpha Partners, Ltd., James Douglas Maxwell a/k/a Doug Maxwell, Santa Fe Auto Insurance Company, and James Thornton Maxwell a/k/a Jim Maxwell.*

for Lincoln General with an A rated reinsurer authorized to do business in Pennsylvania;

(c)    Santa Fe was to fund all costs associated with the investigation, settlement, contesting, and handling of claims related to the GAAs and Reinsurance Agreements and all addenda to those agreements; and

(d)    Santa Fe was to pay $1.5 million to Lincoln General.

5.    Defendants never fulfilled any of the above-referenced obligations under the MOU. As a result, it has been necessary for Lincoln General to file this second lawsuit ("Second Lawsuit") against the Defendants.

6.    Prior to filing this Second Lawsuit, Lincoln General obtained an assignment of all rights State and County (now named Hallmark County Mutual Insurance Company) has, or could have, against U.S. Auto arising out the GAAs and Reinsurance Agreements, at law, and in equity. A true and correct copy of the Assignment of Rights is attached as **Exhibit C**.

7.    Finally, since Doug Maxwell, U.S. Auto, Gamma, and Alpha have engaged in the unauthorized business of insurance, Lincoln General requests that, pursuant to Texas Insurance Code § 101.353, those Defendants be required to deposit at least $17,705,268 in cash or securities or file a bond with good and sufficient sureties to satisfy any judgment before they are permitted to file any pleadings in this litigation.

## II. PARTIES

8.    Plaintiff Lincoln General is a Pennsylvania corporation with its principal place of business in York, Pennsylvania.

9.    Defendant U.S. Auto is a Texas corporation with its principal place of business in Dallas, Texas.   Because at all times relevant hereto, U.S. Auto was an unauthorized person engaging in the business of insurance within the state of Texas, U.S. Auto may be served by serving the Commissioner of Insurance for Texas.   The Commissioner of Insurance for Texas may be served by serving the Texas Department of Insurance, 333 Guadalupe, Austin, TX 78701.

10.    Defendant Gamma is a Texas corporation with its principal place of business in Dallas, Texas.   Because at all times relevant hereto, Gamma was an unauthorized person engaging in the business of insurance within the state of Texas, Gamma may be served by serving the Commissioner of Insurance for Texas.   The Commissioner of Insurance for Texas may be served by serving the Texas Department of Insurance, 333 Guadalupe, Austin, TX 78701.

11.    Defendant CSI is a Texas corporation with its principal place of business in Dallas, Texas.   CSI may be served through its designated, registered agent for service Lisa M. Steible, 4231 Shady Hill Dr., Dallas, Texas 75229.

12.    Defendant Alpha is a Texas limited partnership with its principal place of business in Dallas, Texas.   The general partner of Alpha is CSI, and Doug Maxwell and Jim Maxwell are limited partners.   Because at all times relevant hereto, Alpha was an unauthorized person engaging in the business of insurance within the state of Texas, Alpha may be served by serving the Commissioner of Insurance for Texas.   The Commissioner of Insurance for Texas may be served by serving the Texas Department of Insurance, 333 Guadalupe, Austin, TX 78701.

13. Defendant Doug Maxwell is an individual who resides in Dallas, Texas. Because at all times relevant hereto, Doug Maxwell was an unauthorized person engaging in the business of insurance within the state of Texas, Doug Maxwell may be served by serving the Commissioner of Insurance for Texas. The Commissioner of Insurance for Texas may be served by serving the Texas Department of Insurance, 333 Guadalupe, Austin, TX 78701.

14. Defendant Santa Fe is a Texas Professional Corporation which conducts business in Texas and has its principal place of business in Dallas, Texas. Santa Fe may be served through its designated, registered agent for service CT Corporation, 350 North St. Paul St., Suite 2900, Dallas, Texas 75201.

15. Defendant Jim Maxwell is an individual who resides in Dallas, Texas. He is a citizen of Texas and may be served at his place of residence located at 6263 Preston Creek Dr., Dallas, Texas 75240 or wherever he may be located.

### III. JURISDICTION AND VENUE

16. This Court has jurisdiction over this matter under 28 U.S.C. § 1332(a), because this action is between citizens of different states and the matter in controversy exceeds the sum or value of $75,000, exclusive of interest and costs.

17. This Court has personal jurisdiction over Defendants because they are citizens of Texas and/or regularly conduct business within the Northern District of Texas.

18. Venue is proper under 28 U.S.C. § 1391(a) and (c) because one or more of the Defendants resides in this District and a substantial part of the events or omissions giving rise to Lincoln General's claims occurred in this District. Further, some of Lincoln General's claims arise under a contract specifying that such claims are to be brought in Dallas County, Texas.

## IV. FACTUAL BACKGROUND

**A.**      **Defendants Doug and Jim Maxwell and the Maxwell Group**

19.      Defendants U.S. Auto, Gamma, CSI, Alpha, and Santa Fe (collectively, the "Maxwell Group") are affiliated companies (See **Exhibit D** attached hereto.) that share a business address and office space, have acted as guarantors for at least some of each others' liabilities, sponsor and administer shared benefit plans, share (at least in part) common ownership and leadership, have combined financial statements (at least with regard to all companies but Santa Fe, which was in start-up and had not commenced doing business as of the end of 2006, the last year for which financial statements are available to Plaintiffs), and share and integrate their resources to achieve the common business purpose of providing insurance-related services.

20.      At all times relevant hereto, Doug Maxwell was the owner, in whole or part, directly or indirectly, of each of the members of the Maxwell Group, and his ownership interests in these entities are substantial.  He was the lone director, President, Vice President, Secretary, and Treasurer of U.S. Auto and Gamma; a director, Vice President, and Treasurer of CSI; a limited partner in Alpha, for which the general partner is CSI; and a director and President of Santa Fe.  As such, Doug Maxwell maintains full and complete control over U.S. Auto and Gamma and significant control over all other members of the Maxwell Group.

21.      Doug Maxwell has commingled his individual assets with those of the Maxwell Group, including, but not limited to, providing an interest free and unsecured loan of $200,000 to Alpha and an interest free and unsecured loan of $250,000 to U.S. Auto.

22.     Jim Maxwell is Doug Maxwell's father.  At all times relevant hereto, Jim Maxwell directly or indirectly, was a partial owner of CSI, Alpha, and Santa Fe, and an officer of CSI. Jim Maxwell provided substantial funding and financing to various members of the Maxwell Group and has remained involved with their business dealings.

23.     In addition, upon information and belief, U.S. Auto, Gamma, CSI, and Alpha are inadequately capitalized.  As of the end of 2006, their combined stockholders' equity and partners' capital is believed to have been approximately negative $471,000.

24.     Further, Defendants utilized Alpha as a conduit through which money generated by other members of the Maxwell Group was funneled to Doug Maxwell, Jim Maxwell, and Santa Fe.  For example, primarily using revenue generated by U.S. Auto from the GAAs and Reinsurance Agreements with Lincoln General, Alpha and its general partner CSI distributed more than $20 million to Doug Maxwell and more than $30 million to Jim Maxwell from July 2002 through December 2008.  In addition, Alpha provided $2,200,000 in capital in 2005 and $3,200,000 in Surplus Notes to Santa Fe in 2007 (See **Exhibit E**.).  These improper and excessive transfers and distributions were made when Defendants knew or had reason to know they would ultimately have to return millions of dollars in commissions and other amounts to Lincoln General.  It is believed that these transfers and distributions were made for the dishonest purpose of preventing Lincoln General from recovering amounts it is owed.

25.     The Reinsurance Agreements provide that Benfield, Inc ("Benfield") was to be recognized as the reinsurance intermediary negotiating the Reinsurance Agreements, and all communications, including but not limited to notices, statements, premium, return premium, commissions, taxes, losses, loss adjustment expenses, salvages, and loss settlements were required to be transmitted to State and County or Lincoln General through Benfield.  State and

1566500

County paid Benfield a broker's commission of 1% of collected premium for the services it provided.

26.     At all times relevant hereto, Alpha and Benfield shared the 1% brokerage commission for the reinsurance intermediary services provided by Benfield to State and County in relation to the Reinsurance Agreements.  Alpha also provided management services to U.S. Auto relating to the underwriting, servicing and administration of the business arising from the Reinsurance Agreements.

27.     The Maxwell Group and each of its members serve as Doug Maxwell's alter ego through which he engages in various facets of the insurance business, and he is individually liable for the acts, duties, and responsibilities of each of those companies.  Further, the members of the Maxwell Group serve as each others' alter egos.

**B.     The Reinsurance Agreements and GAAs Between
        Lincoln General, U.S. Auto, and State and County**

28.     Until 2009, Lincoln General engaged in various lines of business, with a specialty in transportation related insurance.  Among Lincoln General's practices was the reinsuring of policies issued by other insurance companies.

29.     Lincoln General, U.S. Auto, and State and County entered into two, similar GAAs, both of which incorporate corresponding Reinsurance Agreements.  These Reinsurance Agreements, one executed in 2002 and one executed in 2003, are similar to one another, and each bears the title of Texas Non-Standard Private Passenger Quota Share Reinsurance Agreement.

30.     Pursuant to the Reinsurance Agreements, Lincoln General reinsured State and County for certain automobile insurance policies sold by U.S. Auto, as State and County's managing general agent.

---

31.     Specifically, under the 2002 Reinsurance Agreement, Lincoln General reinsured State and County for 45% of its gross liability on ceded policies incepting or renewing between July 1, 2002, and June 30, 2003 (the "2002 Agreement Year"), in exchange for 45% of the gross written premiums (whether or not collected) under such policies less certain amounts.

32.     Per the terms of the 2003 Reinsurance Agreement, Lincoln General accepted 100% of the business, credit, and insurance risk arising from the business produced under the Reinsurance Agreements and agreed to indemnify State and County for 100% of its gross liability arising under ceded policies incepting or renewing on or after July 1, 2003, in exchange for 100% of the gross written premiums (whether or not collected) under such policies less certain amounts. The policies effective on or after July 1, 2003 are grouped into four Agreement Years based on the policies' effective dates: July 1, 2003 through June 30, 2004 (the "2003 Agreement Year"); July 1, 2004 through September 30, 2005 (the "2004 Agreement Year"); October 1, 2005 through December 31, 2006 (the "2005 Agreement Year"); and January 1, 2007 through December 31, 2007 (the "2007 Agreement Year").

33.     Pursuant to the GAAs and Reinsurance Agreements, U.S. Auto performed various tasks - such as the collection and handling of premiums. As the Reinsurance Agreements clarified, despite being identified for regulatory purposes as the agent for State and County, U.S. Auto acted on Lincoln General's behalf in performing these tasks. Further, as reinsurer, Lincoln General was an actual and intended beneficiary of U.S. Auto's various duties and obligations to State and County.

34.     In exchange for its services, the Reinsurance Agreements provided that U.S. Auto would receive 20.6% of premiums as a base commission, - referred to as "ceding commissions" in the Reinsurance Agreements.

35.     In addition to the base commission, U.S. Auto could receive an adjusted commission, which was referred to as a Profit Commission in the GAA (hereinafter ,"Contingent Commission") from collected premiums as a reward for good program performance if Incurred Losses[2] were below specified targets.

36.     Pursuant to Section 15.1 of the GAAs and Section 12.02 of the Reinsurance Agreements, U.S. Auto's sole compensation for handling claims, and Lincoln General's liability for loss adjustment expenses incurred for any Agreement Year is an amount equal to 8% of Earned Premiums. This 8% is a component of Incurred Losses when calculating the Contingent Commission.

37.     Per the terms of the GAAs and Reinsurance Agreements, and as required by Texas law, U.S. Auto accepted and maintained premiums and other funds as a fiduciary for State and County and Lincoln General. As such, U.S. Auto owed and continues to owe various duties imposed by equity, contract, and law.

38.     U.S. Auto was required to separately maintain collected premiums in one or more premium trust accounts. The GAAs expressly provided that U.S. Auto was not to commingle collected premiums with other funds. Accordingly, the collected premiums U.S. Auto held in trust were specific, separate, and identifiable.

---

[2]   Incurred Losses is a defined term under the Reinsurance Agreements, defined as the sum of losses paid and allocated loss adjustment expenses paid plus reserves for outstanding losses and outstanding allocated loss adjustment expenses (including losses from a loss in excess of policy limits or any extra contractual obligations) plus an amount representing "Incurred but not reported" losses (aka "IBNR").

39.     The GAAs allowed U.S. Auto to deduct certain amounts from the collected premiums held in trust - such as payments for losses, amounts due to Lincoln General and State and County, premium refunds to policyholders, the 8% allowance for loss adjustment expenses, the 20.6% ceding commission, and Contingent Commission payments.   U.S. Auto (through Benfield) was to forward any positive balance due to Lincoln General on a monthly basis.

40.     In actuality, Gamma, not U.S. Auto, typically made and received payments from Benfield for U.S. Auto.  Further, the premium trust account and/or one or more other accounts utilized to hold premiums and other amounts collected under the GAAs and Reinsurance Agreements were apparently Gamma accounts or accounts held by both U.S. Auto and Gamma.

41.     Beginning on or around late 2006, the premiums collected by U.S. Auto and retained in the premium trust account were insufficient to pay losses arising from the Reinsurance Agreements.  In response, Lincoln General established a Zero Balance Account ("ZBA") funded by Lincoln General for the payment of Lincoln General's share of any claims on policies it reinsured. U.S. Auto was permitted to write checks drawn upon the ZBA to pay for Lincoln General's share of reinsured claims.  Since claim payments were directly funded by Lincoln General, those claims payments should no longer have been deducted from what was to be remitted to Lincoln General each month.

42.     The Reinsurance Agreements also required U.S. Auto to provide Lincoln General with monthly reports detailing and calculating the amounts owed to Lincoln General.  These reports were prepared by Alpha, CSI, and possibly other Defendants.

43.     In accordance with Article 25.16 of the Reinsurance Agreements, all premium, return commissions (commissions withheld by U.S. Auto and required to be returned to Lincoln General because of reductions in premium), Contingent Commissions, and loss adjustment

expense obligations under the Reinsurance Agreements were required to be secured by Defendants U.S. Auto, Gamma, CSI, and Alpha.

## C.  IBNR and Its Impact on U.S. Auto's Commissions

44.     Insurance, by its very nature, entails uncertainty.  Insurance policies typically cover extended periods such as six months or a year, and at any point during a coverage period an event like an automobile accident could occur giving rise to a claim.  At the time a policy is issued, while some or even all of the premiums may have been paid, no losses have yet been incurred, so the uncertainty over how much will eventually be paid out under the policy is at its greatest.  As time passes, this uncertainty decreases.  However, since policyholders are not always immediately aware of or quick to report claims, and disagreements may arise over reported claims, insurers cannot be certain of their total incurred losses under policies until several years after those policies' coverage periods have ended.

45.     To deal with this uncertainty, the Reinsurance Agreements provided that an appropriate measure of Incurred But Not Reported losses ("IBNR") was to be included as a component when calculating U.S. Auto's Contingent Commissions.  As its name suggests, IBNR represents an estimate of the losses that have not yet, but will eventually, be reported and paid under the reinsured policies.  Without IBNR, Incurred Losses would be understated and the profitability of the program would be overstated.  Further, since U.S. Auto does not earn a Contingent Commission unless Incurred Losses are below target levels, and U.S. Auto's Contingent Commissions are withheld from the premiums to be paid to Lincoln General, the inclusion of IBNR is crucial to assuring that collected premiums are properly distributed.

D.     **U.S. Auto's Improper Inflation of Its Contingent Commissions and
Refusal to Pay Amounts Owed to Lincoln General**

46.     In April 2007, U.S. Auto ceased issuing State and County policies to be reinsured by Lincoln General and U.S. Auto began renewing the expiring State and County policies with Santa Fe pursuant to the terms of a Managing General Agency agreement between U.S. Auto and Santa Fe. Although no new policies or renewals of existing policies were reinsured by Lincoln General, U.S. Auto's decision to issue policies reinsured by Santa Fe had no impact on the existing policies reinsured by Lincoln General.

47.     As a result of U.S. Auto's placement of renewal policies with Santa Fe, the insurance policies under the Lincoln General GAAs and the Reinsurance Agreements would ultimately "run off." In particular, over the 12 months following U.S. Auto's decision to stop issuing policies reinsured by Lincoln General that entire book of business was extinguished by the natural expiration or cancellation of the policies in force.

48.     The last payment received from U.S. Auto was for the April 2007 activity, which was received on or about June 15, 2007. Without explanation, on July 15, 2007, U.S. Auto failed to pay Lincoln General the $1,114,264.33 balance that was owed for the May 2007 activity.

49.     No longer in need of Lincoln General as a reinsurer, U.S. Auto developed a scheme to justify withholding any future premiums owed to Lincoln General. More specifically, after including IBNR in Incurred Losses for more than four years, U.S. Auto, with the assistance of the other Defendants, intentionally, improperly and wrongfully began excluding IBNR from the Incurred Losses component of the Contingent Commission calculation for all policies incepting or renewing before January 1, 2007 (the last Agreement Year of the 2003 Reinsurance Agreement). As reflected on **Exhibit F**, this erroneous change was U.S. Auto's wrongful attempt to avoid paying Lincoln General $4,640,967.95 due on August 15, 2007. Combined with the past

due $1,114,264.33 payment from July 15, 2007, U.S. Auto now owed Lincoln General $5,755,232.28.

50.     As set forth in greater detail in **Exhibit F**, U.S. Auto's continued pattern of wrongfully withholding payments from Lincoln General led to ever increasing overdue balances. By knowingly and wrongfully inflating its Contingent Commission, U.S. Auto artificially eliminated any balance owed to Lincoln General.  By wrongfully and erroneously calculating the Contingent Commission, U.S. Auto was in complete violation of the Reinsurance Agreements. Furthermore, by artificially inflating its Contingent Commission, U.S. Auto wrongfully claimed that Lincoln General owed it money for Contingent Commissions.  Accordingly, U.S. Auto improperly and wrongfully withheld premium payments to Lincoln General.

51.     On multiple occasions, Lincoln General informed U.S. Auto, Jim Maxwell, Doug Maxwell, State and County, Benfield, Gamma, CSI, and Alpha, that Lincoln General was concerned U.S. Auto was mishandling collected premiums and wrongfully calculating Contingent Commissions and requested payment for past due amounts.

52.     In response, U.S. Auto, through Doug Maxwell, admitted that IBNR had been excluded.  However, U.S. Auto refused to pay the amounts owing to Lincoln General and withheld additional amounts in subsequent months.

53.     To further manipulate and overstate U.S. Auto's Contingent Commissions and understate the amount owed to Lincoln General, in 2008, U.S. Auto continued to exclude IBNR for the 2002-2005 Agreement Years and removed all IBNR from the 2007 Agreement Year Contingent Commission calculations.

54.     In November 2008, contrary to the representations made by  Doug Maxwell in letters dated September 10, 2007 (**Exhibit G**) and October 10, 2007 (**Exhibit H**),[3] Jim Maxwell informed Lincoln General (in a face to face meeting with Gary J. Orndorff, Lincoln General's Executive Vice President) that it would not receive any further payments from the Defendants. At that meeting, Jim Maxwell also stated that Lincoln General would not be realizing the Reinsurance Margin (See Paragraph 66 for a definition of Reinsurance Margin.) that Lincoln General was entitled to under the Reinsurance Agreements.

55.     In early 2009, Defendants added another layer to their scheme to misappropriate millions in premiums and other funds owed to Lincoln General.  As reflected by the overdue amounts shown on **Exhibit F,** excluding IBNR from the Contingent Commission calculations was no longer sufficient for U.S. Auto to hide the fact that millions of dollars were owed to Lincoln General.  As a result, U.S. Auto began improperly claiming it was owed more than $19 million in reimbursement for legal fees and expenses incurred in handling and settling reinsured claims.  Attorney fees and other legal expenses incurred by U.S. Auto in handling, investigating, and settling claims reinsured by Lincoln General are loss adjustment expenses.  However, U.S. Auto had already been compensated for such legal fees and expenses through its 8% contractual allowance for loss adjustment expenses as noted in Paragraph 36.[4]  Prior to that time, U.S. Auto never claimed entitlement for any legal expenses beyond the 8% loss adjustment expense allowance it had already received.

---

[3]     Exhibit H contains Doug Maxwell's October 10, 2007, letter without enclosures.

[4]     Section 15.1 of the GAA states "The Agent [U.S. Auto] shall receive all of the Loss Adjustment Expense allowance specified in the Reinsurance Agreement as its sole compensation for handling claims".  Section 12.02 of the Reinsurance Agreement states "In the event the Reinsurer's [Lincoln General's] liability for allocated loss adjustment expense incurred for any Agreement Year exceeds 8.0% of Premiums Earned for the same Agreement Year, the Agent [U.S. Auto] shall offset the difference through a reduction of commissions otherwise due the Agent [U.S. Auto] hereunder in accordance with the provisions of ARTICLE IX – COMMISSIONS, PAYMENTS AND FEES".

56. As of June 30, 2010, U.S. Auto and the other Defendants withheld and misappropriated $16,500,710 owed to Lincoln General, as reflected in **Exhibit F**. This amount is expected to increase to $17,705,268 as the final claims are paid and closed. Lincoln General is entitled to these funds, which include premiums and other funds U.S. Auto was required by contract and statutory law to maintain in a premium trust account and to remit to Lincoln General but which U.S. Auto instead improperly utilized under the guise of withholding commissions.

57. Upon information and belief, contrary to its contractual, legal, and fiduciary duties, U.S. Auto misappropriated funds, which it was obligated to hold in trust or otherwise as a fiduciary and remit to Lincoln General, for improper purposes including, but not limited to, the funding of Alpha, Santa Fe, and/or other Defendants and the personal enrichment of Doug Maxwell and/or Jim Maxwell. Defendants accepted such misappropriated funds despite knowing or having reason to know that the funds were owed to Lincoln General.

58. All Defendants actively assisted and participated in this scheme to withhold and misappropriate millions of dollars owed to Lincoln General with full knowledge that the conduct of both violated contractual obligations and fiduciary duties.

59. Upon information and belief, Jim Maxwell intentionally and willfully assisted, induced, and/or conspired in U.S. Auto's violation of the Reinsurance Agreements and GAAs and U.S. Auto's breach of trust and/or fiduciary duties. Though not an officer, owner, or director of U.S. Auto, Jim Maxwell was involved in U.S. Auto's improper conduct and was motivated by both his pecuniary interests, as partial owner of Santa Fe, CSI, and Alpha and as a lender to one or more members of the Maxwell Group, and by virtue of his familial relationship to Doug Maxwell. Further, Jim Maxwell, along with Doug Maxwell, is behind the decision to improperly distribute millions of dollars from Alpha to Jim Maxwell and Doug Maxwell which were

generated as commissions by U.S. Auto and ultimately were to be returned to Lincoln General. In addition, Jim Maxwell, along with Doug Maxwell, is believed to have participated in the misappropriation/conversion of millions of dollars in premiums and other funds owed to Lincoln General.

**E.      U.S. Auto's and/or Gamma's Improper Use of the ZBA**

60.      U.S. Auto's obligations under the Reinsurance Agreements and GAAs included the proper handling, administration, and payment of claims.   Upon information and belief, Gamma, which was designated as claims administrator under those agreements, assisted U.S. Auto in handling, administering, and paying claims.

61.      In breach of its fiduciary duties and contractual obligations, U.S. Auto improperly utilized the funds from the ZBA to pay for claims on insurance policies not reinsured by Lincoln General or to pay for more than Lincoln General's share of reinsured claims.   For example, Lincoln General only reinsured 45% of the insurance policies issued under the 2002 Reinsurance Agreement; however, U.S. Auto paid 100% of losses under those policies out of the ZBA. Lincoln General has not been reimbursed $845,052 for those improper payments.  (This amount is included in the figures reflected in **Exhibit F** and **Exhibit J.**)

62.      Upon information and belief, Gamma also improperly utilized the ZBA or assisted U.S. Auto in doing so.

63.      Lincoln General remains liable to State and County for all business credit, and insurance risk arising out of the Reinsurance Agreements.   Accordingly, Lincoln General, has, and must continue to pay for all claims arising from the policies reinsured by Lincoln General despite the Defendant's misappropriation/conversion of millions of dollars in premiums and other funds owed to Lincoln General.

64.    As a result of Defendants' individual and concerted actions, Lincoln General has suffered and continues to suffer damages, loss, and injury, which may result in Lincoln General not being able to satisfy all of its reinsurance and policyholder obligations.

**F.    The Reinsurance Margin**

65.    Under the GAAs and Reinsurance Agreements, U.S. Auto's Ceding Commission was 20.6% of collected premiums, plus 100% of the difference between the target loss ratio of 69.40% [70.90% for the 2002 Agreement Year] and the actual Loss Ratio.[5]   In other words, the lower the loss ratio, the higher U.S. Auto's Contingent Commission.

66.    Based on this formula, 90% of collected premiums [91.5% for the 2002 Underwriting Year] were allocated for the payment of claims, claim adjustment expenses, and U.S. Auto's Ceding Commission.  The remaining 10% of the collected premium [8.5% for the 2002 Agreement Year] was to be kept by Lincoln General ("Reinsurance Margin").

67.    The Reinsurance Margin provides Lincoln General with premium dollars to compensate for the risk incurred by Lincoln General for reinsuring the subject business.

68.    The only set of circumstances whereby Lincoln General would not be entitled to 100% of the Reinsurance Margin would be if the actual Loss Ratio exceeded 69.40% for Agreement Years other than 2002 [70.90% for the 2002 Agreement Year].

69.    Based on information and belief, the actual Loss Ratio for the business subject to the Reinsurance Agreements is far less than the target 69.40% loss ratio for Agreement Years other than 2002 [70.90% for the 2002 Agreement Year].  (See **Exhibit I.**)  Accordingly, Lincoln General is entitled to 100% of the Reinsurance Margin for all Agreement Years.

---

[5]    The eight percent (8%) allowance for loss adjustment expenses is included in the target loss ratio and the actual Loss Ratio.

70.     As shown on **Exhibit J**, although Lincoln General is entitled to receive $30,919,865 as a result of reinsuring the insurance policies sold by U.S. Auto, through June 30, 2010, U.S. Auto has only remitted a net total of $15,563,315.

71.     As of June 30, 2010, the Reinsurance Margin owed by U.S. Auto to Lincoln General (on a cash basis) was $15,356,550.

72.     As of May 31, 2010 the case reserves established by U.S. Auto for the remaining losses under the policies reinsured by Lincoln General are $506,816.  As of June 30, 2010, Lincoln General's internal actuaries calculated the amount of IBNR losses to be $1,841,902 for the policies reinsured by Lincoln General.[6]  Accordingly, U.S. Auto will owe Lincoln General an additional $2,348,718 when all claims for all Agreement years have been paid and closed (**Exhibit J**).  The total Reinsurance Margin due and not paid to Lincoln when all claims are paid and closed will be $17,705,268.

73.     As referenced in Paragraph 54 of this Second Lawsuit, in a September 10, 2007 letter (**Exhibit G**) to Lincoln General, Doug Maxwell wrote "US Auto can assure you that all losses will be paid without any loss of margin [Reinsurance Margin] to Lincoln.  In the event that the amount in excess of margin were to become inadequate to pay losses as they become due, US Auto will pay such losses without use of the Lincoln ZBA." This statement was clearly made to mislead Lincoln General; the Defendants never intended to take actions to assure Lincoln General would retain its full Reinsurance Margin under the reinsurance arrangement. This is evidenced by the fact that when all losses have been paid, Lincoln General will have received $17,705,268 less than the Reinsurance Margin it is entitled to receive.  Rather than compensating Lincoln General or fund the claims themselves, Defendants    drained U.S. Auto and

---

[6]     As previously discussed, IBNR represents losses that are expected but have not yet been reported by the insureds.

misappropriated millions of dollars in premiums and other amounts owed to Lincoln General for their own benefit.

**G.    Damages**

74.    Section IV. D of this Second Lawsuit discusses the monthly payments required by U.S. Auto in accordance with the Reinsurance Agreements.  Details of the monthly payments required are in **Exhibit F**.  U.S. Auto's invoiced amounts due after corrections reflect a balance due Lincoln General, as of June 30, 2010, of $16,500,710.  A small number of timing issues, which will be cleared as all claims are paid and closed, results in a future amount due Lincoln General from U.S. Auto of $1,204,558.  In summing the unpaid invoices, U.S. Auto owes Lincoln General $16,500,710 as of June 30, 2010, and will owe Lincoln General $17,705,268 when all claims are paid and closed.

75.    Section IV. F of this Second Lawsuit discusses the Reinsurance Margin, a concept that is supported by the Reinsurance Agreements and acknowledged by Doug Maxwell in letters dated September 10, 2007 (**Exhibit G**) and October 10, 2007 (**Exhibit H**).  Further detail of the Reinsurance Margin is included as **Exhibit J**.  The Reinsurance Margin due Lincoln General per the Reinsurance Agreements is $30,919,865.  As of June 30, 2010, Lincoln General had received $15,563,315.  As the remaining outstanding case reserves and IBNR are paid, U.S. Auto will owe Lincoln General an additional $2,348,718.  In summary, utilizing the Reinsurance Margin method, U.S. Auto will owe Lincoln General $17,705,268 when all claims are paid and closed.

76.    The Damages of this Second Lawsuit are established in two separate and independent calculations: 1) per the Reinsurance Agreements and subsequent invoices, which prove damages of $17,705,268; and 2) per the Reinsurance Margin, which prove damages of $17,705,268.

## V. CLAIMS

**A.      Breach of Contract (Lincoln General v. U.S. Auto)**

77.     Lincoln General incorporates by reference for all purposes the allegations set forth in the paragraphs above.

78.     As set forth above, Defendant U.S. Auto is in default of its contractual obligations with Lincoln General under the Reinsurance Agreements, GAAs, and the agreement concerning the use of the ZBA.  At all times, Lincoln General performed or substantially performed its obligations under those contracts.

79.     As a direct and proximate result of U.S. Auto's past and ongoing breach of its contractual obligations, Lincoln General suffered and continues to suffer damage, loss, and injury.  As of June 30, 2010, U.S. Auto is liable to Lincoln General for $ 17,705,268 as a result of its own conduct.

80.     Pursuant to Section 38.001 *et seq.* of the Texas Civil Practice and Remedies Code, Defendants are obligated to pay Lincoln General's reasonable attorneys' fees and costs incurred herein through any appeal.

**B.      Conversion of expiring insurance policies (Lincoln General v. U.S. Auto & Santa Fe)**

81.     Lincoln General incorporates by reference for all purposes the allegations set forth in the paragraphs above.

82.     On May 1, 2007, U.S. Auto began transferring expiring policies to Santa Fe pursuant to the terms of the Reinsurance Agreements and GAAs which vested use and control of the expiring policies in U.S. Auto.

83.     On July 15, 2007, U.S. Auto defaulted under the Reinsurance Agreements and GAAs, by failing to remit the amount owed on the May 2007 invoices, resulting in a long period of negotiations which ended with the filing of the First Lawsuit on November 27, 2007.

84.     State and County terminated the GAA effective January 23, 2008.  The terms of the Reinsurance Agreements and GAA provide that upon termination of the GAA, the use and control of expiring policies remains the property of U.S. Auto *only* if U.S. Auto has accounted for and paid over all premiums for which it may be liable.  By virtue of the continuing default, which began on July 15, 2007, U.S. Auto lost the use and control of expiring policies, at the latest, as of January 23, 2008.

85.     As a direct and proximate result of U.S. Auto's misappropriation of the use of and control of the expiring policies under the Reinsurance Agreements and GAAs, Lincoln General suffered and continues to suffer damage, loss, and injury.  U.S. Auto is liable as a result of its own conduct.

86.     As the current possessor and beneficiary of the records, use, and control of the expiring insurance policies, Santa Fe has converted property that rightfully belongs to Lincoln General.  Accordingly, Santa Fe is liable to Lincoln General for damages arising from U.S. Auto's misappropriation of the use and control of the expiring contracts

## C.     Breach of Trust and/or Fiduciary Duties (Lincoln General v. U.S. Auto)

87.     Lincoln General incorporates by reference for all purposes the allegations set forth in the paragraphs above.

88.   Defendant U.S. Auto owes various fiduciary duties to Lincoln General.   U.S. Auto breached such duties through the misappropriation, diversion, and/or conversion of funds it held in trust or otherwise as a fiduciary for Lincoln General and which should have been, but were not, transmitted to Lincoln General.

89.   In addition, Defendant U.S. Auto owes various fiduciary duties to State and County, for which Lincoln General is beneficiary.   U.S. Auto breached such duties through the misappropriation, diversion, and/or conversion of funds it held in trust or otherwise as a fiduciary and which should have been, but were not, transmitted to Lincoln General.

90.   Further, U.S. Auto breached its fiduciary duties owed to Lincoln General as well as fiduciary duties owed to State and County, for which Lincoln General was the beneficiary, through the improper use of the ZBA and the funds U.S. Auto accepted, handled, or maintained from the ZBA.

91.   As a direct and proximate result of these wrongful acts and omissions, Lincoln General and State and County suffered damages, as of June 30, 2010, in the amount of $17,705,268.

**D.   Misappropriation and Conversion of Funds (Lincoln General v. U.S. Auto)**

92.   Lincoln General incorporates by reference for all purposes the allegations set forth in the paragraphs above.

93.   U.S. Auto intentionally and knowingly misappropriated and/or converted specific, identifiable funds it held in trust or otherwise as a fiduciary for Lincoln General or State and County.   U.S. Auto was obligated to separately maintain and provide such funds to Lincoln General but instead improperly withheld and utilized the funds for the benefit of Doug Maxwell, Jim Maxwell, and/or members of the Maxwell Group.

94. In addition, U.S. Auto intentionally and knowingly misappropriated and/or converted specific, identifiable funds belonging to Lincoln General through the improper use of the ZBA to pay insurance claims not reinsured by Lincoln General or to make complete payments for claims only partially reinsured by Lincoln General. U.S. Auto and/or other of the Defendants benefited from this improper use of the ZBA.

95. As a direct and proximate result of these wrongful acts and omissions, Lincoln General suffered damages, as of June 30, 2010, in the amount of $17,705,268.

**E.     Tortious Interference with Contract (Lincoln General v. Gamma)**

96. Lincoln General incorporates by reference for all purposes the allegations set forth in the paragraphs above.

97. Defendant Gamma with full knowledge and intent, willfully induced, encouraged, aided, and/or assisted Defendant U.S. Auto's breach of the Reinsurance Agreements, GAAs, and the use of the ZBA to pay claims not reinsured by Lincoln General.

98. As a direct and proximate result of these wrongful acts and omissions which were directed to and did result in U.S. Auto's breach of its contractual obligations, Lincoln General suffered damages, as of June 30, 2010, in the amount of $17,705,268.

**F.     Breach of Trust/Fiduciary Duties (Lincoln General v. Doug Maxwell)**

99. Lincoln General incorporates by reference for all purposes the allegations set forth in the paragraphs above.

100. By virtue of his position as the sole director, President, Vice President, Treasurer and Secretary of U.S. Auto, Doug Maxwell is charged with fiduciary responsibilities in regards to U.S. Auto's activities arising from the Reinsurance Agreements and GAAs.

101.    Doug Maxwell breached such duties by failing to prevent the misappropriation, diversion, and/or conversion of funds U.S. Auto held in trust or otherwise as a fiduciary for Lincoln General and which should have been, but were not, transmitted to Lincoln General.

102.    Further, Doug Maxwell breached his fiduciary duties owed to Lincoln General as well as fiduciary duties owed to State and County, for which Lincoln General was the beneficiary, by failing to prevent the improper use of the ZBA and the funds U.S. Auto accepted, handled, or maintained from the ZBA.

103.    As a direct and proximate result of these wrongful acts and omissions, Lincoln General and State and County suffered damages, as of June 30, 2010, in the amount of $17,705,268.

## G.    Aiding and Abetting Breach of Trust and/or Fiduciary Duties

104. Lincoln General incorporates by reference for all purposes the allegations set forth in the paragraphs above.

105. Defendants Doug Maxwell, Jim Maxwell, CSI, Alpha, and Santa Fe, with full knowledge and intent, actively induced, aided, and/or encouraged Defendant U.S. Auto's breach of trust and/or fiduciary duties.

106. As a direct and proximate result of these wrongful acts and omissions, Lincoln General and State and County suffered and continue to suffer damage, loss, and injury.

107. Any and all amounts improperly diverted to any of the Defendants as a result of U.S. Auto's breach of trust and/or fiduciary duties, and all profits earned through the use of such misappropriated, diverted, or converted funds, should be deemed to be held in constructive trust for the benefit of Lincoln General, individually and as State and County's assignee.

### H.   Tortious Interference with Contract

108.   Lincoln General incorporates by reference for all purposes the allegations set forth in the paragraphs above.

109.   Defendants CSI, Alpha, and Santa Fe have, with full knowledge and intent, willfully induced, encouraged, aided, and/or assisted Defendant U.S. Auto's breach of the Reinsurance Agreements, GAAs, and the agreement concerning the use of the ZBA.

110.   Defendant Jim Maxwell, with full knowledge and intent, willfully induced, encouraged, aided, and/or assisted Defendant U.S. Auto's breach of the Reinsurance Agreements and GAAs.

111.   As a direct and proximate result of these wrongful acts and omissions which were directed to and did result in U.S. Auto's breach of its contractual obligations, Lincoln General suffered and continues to suffer damage, loss, and injury.

### I.   Alter-Ego Liability

112.   Lincoln General incorporates by reference for all purposes the allegations set forth in all preceding paragraphs.

113.   As set forth above, as a direct and proximate result of U.S. Auto's past and ongoing breach of its contractual obligations, Lincoln General suffered and continues to suffer damage, loss, and injury.  U.S. Auto is liable for such amounts as a result of its own conduct. However, Doug Maxwell, Gamma, CSI, Alpha, and Santa Fe are liable by virtue of the alter ego doctrine, which should be applied to avoid unfairness.

114.   As set forth above, as a direct and proximate result of U.S. Auto's breach of trust/fiduciary duties, Lincoln General suffered and continues to suffers damage, loss, and injury.  U.S. Auto is liable for such amounts as a result of its own conduct.  However, Doug

Maxwell, Gamma, CSI, Alpha, and Santa Fe are liable by virtue of the alter ego doctrine, which should be applied to avoid unfairness.

115.   As set forth above, as a direct and proximate result of U.S. Auto's misappropriation and conversion of funds, Lincoln General suffered and continues to suffer damage, loss, and injury.   U.S. Auto is liable for such amounts as a result of its own conduct. However, Doug Maxwell, Gamma, CSI, Alpha, and Santa Fe are liable by virtue of the alter ego doctrine, which should be applied to avoid unfairness.

116.   As set forth above, as a direct and proximate result of Defendants Jim Maxwell, CSI, Alpha, and Santa Fe aiding, and/or encouraging Defendant U.S. Auto's breach of trust and/or fiduciary duties, Lincoln General suffered and continues to suffer damage, loss and injury. Defendants Jim Maxwell, CSI, Alpha, and Santa Fe are liable by virtue of their own conduct. Further, Jim Maxwell, CSI, Alpha and Santa Fe are liable by virtue of the alter ego doctrine which should be applied to avoid unfairness.

## J.   Attorneys' Fees

117.   Lincoln General incorporates by reference for all purposes the allegations set forth in the paragraphs above.

118.   Pursuant to Section 38.001 *et seq.* of the Texas Civil Practice and Remedies Code, Defendants are obligated to pay Lincoln General's reasonable attorneys' fees and costs incurred herein through any appeal.   U.S. Auto is liable for such amounts as a result of its own conduct. Further, Doug Maxwell, Gamma, CSI, Alpha, and Santa Fe are liable by virtue of the alter ego doctrine, which should be applied to avoid unfairness.

## VI. <u>REQUEST FOR DECLARATORY AND INJUNCTIVE RELIEF</u>

**A.** <u>**Declaratory Relief**</u>

119.    Lincoln General incorporates by reference for all purposes the allegations set forth in the paragraphs above.

120.    There is a real and actual controversy between Lincoln General and U.S. Auto regarding their respective rights under the GAAs and Reinsurance Agreements.

121.    As previously indicated, Lincoln General asserts that IBNR must be included in commission and balance due calculations as provided by the Reinsurance Agreements, while Defendants believe no IBNR need be included.

122.    Specifically, Lincoln General asserts the Reinsurance Agreements require that the following IBNR factors, stated as a percentage of Earned Premium for the respective Agreement Years, be included in "Incurred Losses" as part of ceding commission adjustment (a/k/a "Agent's Share of Loss Reduction") and, thus, balance due calculations including the following IBNR percentages – (a) for the 2002 Agreement Year, IBNR of 0%; (b) for the 2003 Agreement Year, IBNR of 2% until the recalculation of the ceding commission adjustment as part of the reporting for activity through June 2009, at which time IBNR becomes 0%; (c) for the 2004 Agreement Year, IBNR of 1.5% until the recalculation of the ceding commission adjustment as part of the reporting for activity through June 2009, at which time IBNR becomes 0%; (d) for the 2005 Agreement Year, IBNR of 3.5% until the recalculation of the ceding commission adjustment as part of the reporting for activity through September 2009, at which time IBNR becomes 1.5% until the recalculation as part of the reporting for activity through September 2010, at which time IBNR becomes 0%; (e) for the 2007 Agreement Year, IBNR of 5% until the recalculation of the ceding commission adjustment as part of the reporting for activity through December 2009, at

which time IBNR becomes 3.5% until the recalculation as part of the reporting for activity through December 2010, at which time IBNR becomes 1.5% until the recalculation as part of the reporting for activity through December 2011, at which time IBNR becomes 0%.

123.    Further, Lincoln General asserts that under the GAAs and Reinsurance Agreements, U.S. Auto and the other Defendants are entitled to no reimbursement or compensation for handling, investigating, or settling claims reinsured by Lincoln General, including for the payment of any attorneys' fees or other legal expenses in connection with such claims handling, investigation, or settlement, except for the loss adjustment expense allowance of 8% of Earned Premiums which U.S. Auto already received.

124.    Further, Lincoln General asserts that by virtue of U.S. Auto's default of its payment obligations under the Reinsurance Agreements and GAAs that the use and control of the expirations arising from the Reinsurance Agreements and GAAs vested in Lincoln General and State and County from the date of U.S. Auto's default on the payment for the May 2007 statement.

125.    Finally, Lincoln General asserts that U.S. Auto may only utilize the ZBA to pay for Lincoln General's share of claims it reinsures.

126.    Accordingly, pursuant to Rule 57 of the Federal Rules of Civil Procedure and 28 U.S.C. § 2201, Lincoln General requests, in addition to any other relief sought or available, that the Court determine and adjudge that each and every one of the propositions stated in paragraphs 118 through 123 state the requirements of the applicable agreements.

127.    Further, Lincoln General requests, in addition to any other relief sought or available, that the Court permanently enjoin U.S. Auto and the other Defendants from (a) calculating ceding commission adjustments or balances due without including IBNR as provided

in paragraph 120 above; (b) claiming entitlement to reimbursements for attorneys' fees or legal expenses incurred in handling, investigating, or settling claims reinsured by Lincoln General beyond the loss adjustment expense allowance of 8% of Earned Premiums which U.S. Auto has already received; and (c) writing checks or otherwise issuing payment out of the ZBA for amounts other than Lincoln General's share of reinsured claims.

## VII. <u>MOTION FOR CERTAIN DEFENDANTS TO POST BOND</u>[7]

### A.    <u>U.S. Auto and Gamma</u>

128.    As discussed above, U.S. Auto was licensed as a Managing General Agency (MGA) from April 2000 to July 25, 2008, when it voluntarily surrendered its license.

129.    Similarly, Gamma Group, Inc. was licensed as a general lines property and casualty agent between April 1995 and July 25, 2008, when it voluntarily surrendered its license.

130.    Despite not being licensed, U.S. Auto and Gamma continue to perform duties under the GAAs and Reinsurance Agreements with State and County and Lincoln General that the Texas Insurance Code defines as the business of insurance, to include, but not limited to handling funds, setting case reserves, adjusting claims or losses and issuing payments thereon[8]. U.S. Auto and Gamma are unauthorized persons engaged in the business of insurance because they have:

- Investigated and adjusted claims or losses (§ 101.051(b)(6)(G));

- Transacted a matter after the effectuation of the contract that arises out of the contract(§ 101.051(b)(6)(H));

---

[7]    The allegations contained within the Motion for Certain Defendants to Post Bond are supported by the Declaration from Charles Basta attached hereto.

[8]    A non exhaustive listing of other activities for which U.S. Auto and Gamma must be licensed that may be implied from claims handling activities are: accepting notice of loss, making coverage determinations and advising policyholders and claimants thereof, and settlement negotiations with claimants or their attorneys.

- Represented or assisted an insurer or person in any other manner in the transaction of insurance with respect to a subject of insurance that is resident, located, or to be performed in Texas(§ 101.051(b)(6)(I));

- Engaged in insurance business specifically recognized as constituting insurance business within the meaning of statutes relating to insurance (§ 101.051(b)(8)); and

- Engaged or proposed to do insurance business that is in substance equivalent to conduct described in § 101.051(b)(1) –(8) in a manner designed to evade statutes relating to insurance(§ 101.051(b)(9)).

131.    By engaging in the business of insurance without a license to do so, U.S. Auto and Gamma violated Texas Insurance Code § 101.102 which prohibits a person or insurer from performing "an act that constitutes the business of insurance" except as is authorized by statute.

132.    Since they are persons unauthorized to engage in insurance business in the state of Texas, Lincoln General requests that pursuant to Texas Insurance Code § 101.353, U.S. Auto and Gamma be required to deposit cash or securities or file a bond with good and sufficient sureties in the amount of at least $17,705,268. before they are permitted to file a pleading in this litigation.

## B.    Doug Maxwell

133.    As discussed above, Doug Maxwell is the sole owner and director of U.S. Auto and Gamma.

134.    Texas Insurance Code § 4001.106 requires that "at least one officer of the corporation . . . and all other persons performing any acts of an agent on behalf of the corporation . . . in this state are individually licensed by the department separately from the corporation."

135.    As the President, Vice President, Secretary and Treasurer of U.S. Auto and Gamma, the Texas Insurance Code required Doug Maxwell to be individually licensed by the

Texas Department of Insurance.  However, Doug Maxwell surrendered his license in July 2008.

Since that time, despite not being licensed, Doug Maxwell has continued to perform duties on

behalf of U.S. Auto and Gamma under the Reinsurance Agreements and GAAs by serving as an

officer of U.S. Auto and Gamma where he directed the activities outlined in Section VII.A

above.  Accordingly, Doug Maxwell is an unauthorized person engaged in the business of

insurance because he has:

- Represented or assisted an insurer or person in any other manner in the transaction of insurance with respect to a subject of insurance that is resident, located, or to be performed in Texas(§ 101.051(b)(6)(I));

- Engaged in insurance business specifically recognized as constituting insurance business within the meaning of statutes relating to insurance (§ 101.051(b)(8)); and

- Engaged or proposed to do insurance business that is in substance equivalent to conduct described in § 101.051(b)(1) –(8) in a manner designed to evade statutes relating to insurance(§ 101.051(b)(9)).

136.    Since Doug Maxwell is a person unauthorized to engage in insurance business in

the state of Texas, Lincoln General requests that pursuant to Texas Insurance Code § 101.353, he

be required to deposit cash or securities or file a bond with good and sufficient sureties in the

amount of at least $17,705,268 before he is permitted to file a pleading in this litigation.

C.    **Alpha**

137.    As previously discussed, Benfield acted as the reinsurance intermediary between

Lincoln General and U.S. Auto.  Benfield and Alpha also entered into a management agreement

whereby Alpha received a commission from Benfield based upon a percentage of collected

premiums from the Reinsurance Agreements in return for providing certain reports to Benfield

that contained information to be reported to Lincoln General by Benfield.  See the April 19, 2002

(**Exhibit K**) and April 20, 2006 (**Exhibit L**) management agreements between Alpha and

Benfield.  As such, Alpha acted as a reinsurance intermediary, which is subject to licensing by the Texas Department of Insurance.

138.    Alpha has not been licensed by the Texas Department of Insurance to act as a reinsurance intermediary.  Accordingly, Alpha is a person unauthorized to engage in the business of insurance within the state.

139.    Alpha also impermissibly engaged in the business of insurance in the following ways:

- Receiving or collecting any consideration for insurance, including a premium or commission (§ 101.051(b)(4)(A) & (B));

- Represented or assisted an insurer or person in any other manner in the transaction of insurance with respect to a subject of insurance that is resident, located, or to be performed in Texas(§ 101.051(b)(6)(I));

- Engaged in insurance business specifically recognized as constituting insurance business within the meaning of statutes relating to insurance (§ 101.051(b)(8)); and

- Engaged or proposed to do insurance business that is in substance equivalent to conduct described in § 101.051(b)(1) –(8) in a manner designed to evade statutes relating to insurance(§ 101.051(b)(9))..

140.    Since Alpha is a person unauthorized to engage in insurance business in the state of Texas, Lincoln General requests that pursuant to Texas Insurance Code § 101.353, Alpha be required to deposit cash or securities or file a bond with good and sufficient sureties in the amount of at least $17,705,268 before it is permitted to file a pleading in this litigation.

## VIII. PRAYER FOR RELIEF

WHEREFORE, PREMISES CONSIDERED Lincoln General requests that the Court enter judgment against Defendants, jointly and severally, and award to Lincoln General the following:

1.      A declaratory judgment;

2.      A permanent injunction;

3.      Actual damages;

4.      Exemplary damages for Defendants' fraudulent, malicious, and/or grossly negligent misconduct;

5.      Constructive trust over all misappropriated funds and their proceeds which U.S. Auto was required to hold in trust or otherwise as a fiduciary or remit to Lincoln General;

6.      Pre-judgment interest at the maximum rate allowed by law;

7.      Lincoln General's costs, including attorneys' fees, expenses and court costs through entry of judgment and appeal;

8.      Post-judgment interest at the maximum rate allowed by law;

9.      Doug Maxwell, Alpha, U.S. Auto and Gamma be required to deposit cash or securities or file a bond with good and sufficient sureties in the amount of $17,705,268 before they are permitted to file a pleading in this litigation; and

10.     Such other and further relief, general and special, at law and in equity, to which Lincoln General is entitled.

Respectfully submitted,

**THOMPSON, COE, COUSINS & IRONS, L.L.P.**


By:   ___/s/ William N. Radford_____
      William N. Radford
      State Bar No.  16455200
      David B. Winter
      State Bar No.  24037731

Plaza of the Americas, 700 N. Pearl Street,
Twenty-Fifth Floor
Dallas, Texas 75201-2832
Telephone:  (214) 871-8212
Telecopy:  (214) 871-8209

  - AND -

Albert B. Miller
Pennsylvania State Bar No. 82540
Application for Admission Pro Hac Vice Pending
Assistant Vice President/Corporate Counsel
Lincoln General Insurance Company
P.O. Box 3709
York, Pennsylvania  17402
Telephone:  (717) 757-0000 ext. 230

**ATTORNEYS FOR PLAINTIFF LINCOLN
GENERAL INSURANCE COMPANY**

---

1566500

## DECLARATION

I declare under penalty of perjury that the averments contained in the foregoing Original Complaint and Motion for Defendants to Post Bond are true and correct to the best of my knowledge, information and belief. Executed on November 12, 2010, at York, Pennsylvania.

_Charles W. Basta_

Charles Basta